LMOORE, J.
Thomas Hannigan appeals an injunction prohibiting him from ■ enclosing the rear patio of his townhouse in Jackson Square, ordering him to remove any .construction already in place and restore the premises to their condition before he began the project, and assessing attorney fees of $1,875.00. The Jackson Square Towne House Homes Association answers the appeal, seeking additional attorney fees at the trial level. For the reasons expressed, we amend and affirm.

Procedural Background

Hannigan owns a corner unit in Jackson Square, a townhouse development in southeast Shreveport. All owners in Jackson Square are subject to restrictive covenants (“the covenants”) which are enforced by a townhouse association (“the Association”). Article VI(a) of the covenants, entitled “Architectural Control,” provides in part:
No budding, fence, wall, or other structure shall be commenced, erected or maintained upon the properties, nor shall any exterior addition to or change or alteration'therein be made until the plans and specifications showing the nature, kind, shape, height, materials and location of the' same shall have been submitted and approved in writing as to harmony of external design and location in relation to surrounding structures and topography by the Board of Directors of the Association, acting as the architectural control committee!.]
Article VI(b) provides for reasonable attorney fees in the event the Association takes legal action to enforce the covenants.
Hannigan, a retired building contractor, obtained in June 2001 the Association’s approval to put a metal roof over his patioi He testified that the metal did not properly attach to the existing roof, so he installed a wood and shingle roof. He admitted that this did not conform with the plan he ^submitted, but he testified that it looked fine and he received many compliments on it. The new roof came within about two feet of the top of an existing cinder-block wall. Hannigan testified that he and his wife had a terrible problem with birds roosting in the partly-enclosed patio.
In January 2003 Hannigan decided to enclose the two-foot strip around the perimeter of his patio. He admitted he did not first seek the Association’s approval, but by January 21 he had sealed off the 35-foot long, two-foot high strip around the patio.
Byron Vincent, president of the Association, first heard about Hannigan’s project *962 on the afternoon of January 21 and called him about it. When Hannigan admitted he was altering the patio, Vincent advised him to submit a request to the Board of Directors, which was meeting that very night. Hannigan sent a letter and hand-drawn plan; the board deferred action until all board members could look at the actual improvements. By a phone vote taken on January 25, the board voted 6-2 to deny the request, but by this time Han-nigan had already completed the exterior work. All that remained was to tape and float the Sheetrock and paint the interior, which Hannigan did not consider “construction.”
The Association filed this suit on February 3, seeking a permanent injunction and reasonable attorney fees.
At trial in October 2003, Hannigan admitted that he failed to obtain prior approval to wall in his patio. However, he felt that the violation was de minimis and the construction completely in harmony with the existing structure. His counsel argued that this satisfied another part of the | ¡¡covenants, Art. IX, § 2 (with emphasis added):
No building shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee as to natural harmony of exterior design with the existing structure and as to location with respect to topography and finished grade elevations.
Hannigan testified that seven or eight other residents have storage sheds, and one has an RV permanently parked in the lot, none of which conforms to the eove-nants, but the Association has taken no action against them. Finally, he testified that one Association member, Joe Leslie, told him that he (Hannigan) had been “getting away with too many things,” and they wanted to “make an example of him.” Hannigan contended that this was proof of bad faith and arbitrary conduct.
Mr. Vincent testified that the Association “went to court” several years ago about the storage sheds, but those suits failed because they were filed “too late.” He added that the normal procedure for owners who wanted to improve their units was to submit plans and wait 30 days for approval, but Hannigan’s enclosure was “very different.” No other unit in the development has an enclosed patio, and the Board of Director’s discussion included concerns that enclosed patios would obstruct other residents’ view.
Both sides offered numerous photos of Hannigan’s patio and the surrounding units.
In written reasons, the district court found that by the time Hannigan submitted his plan to enclose the patio, the work was already 80% complete; [ 4this violated Article VI of the covenants.[1] The court next found that the enclosure was out of harmony with the exterior of the townhouses, contrary to Art. IX, § 2. The court also found insufficient proof that the Association had waived the building restrictions. The court concluded the Association’s action was timely because it filed suit when the construction was not yet complete, and its conduct was neither arbitrary nor capricious. Finally, the court advised the parties to “further discuss” attorney fees or to place the issue on the argument docket.
*963 The Association’s attorney filed two affidavits, claiming a fee of $2,572.50, based on his hourly rate of $175.00.
The court rendered judgment permanently restraining Hannigan from enclosing his patio, and directing him to remove any construction already in place and restore the patio to its prior condition. The court awarded the Association attorney fees of $1,875.00 and costs. As noted, Hannigan has appealed and the Association answered the appeal.

General Principles

Building restrictions are charges imposed by the owner of an immovable in pursuance of a feasible general plan governing building standards, specified uses, and improvements. La. C.C. art. 775. Such restrictions are real rights running with the land and may be enforced by mandatory and prohibitory injunctions. La. C.C. art. 779. A homeowners’ association has the procedural capacity to sue and enforce a subdivision’s building restrictions. Lakeshore Property Owners Ass’n v. Delatte, 579 So.2d 1039 (La.App. 4 Cir.), writ denied, 586 So.2d 560 (1991). When building restrictions require prior approval of any proposed modification, the failure to submit plans and obtain such approval is a violation of the restrictions. Brier Lake Inc. v. Jones, 97-2413 (La.4/14/98), 710 So.2d 1054; Belle Terre Lakes Home Owners Ass’n v. McGovern, 01-722 (La.App. 5 Cir. 1/29/02), 805 So.2d 1286; writ denied, 2002-0818 (La.5/24/02), 816 So.2d 850.
Doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable. La. C.C. art. 783. Apart from the rule of strict construction, documents establishing building restrictions are subject to the general rules of interpreting contracts. Whitaker Const. Co. v. Larkin Dev. Corp., 34,297 (La.App. 2 Cir. 12/6/00), 775 So.2d 571, writ denied, 2001-0068 (La.3/16/01), 787 So.2d 312. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art.2046; Whitaker Const. Co. v. Larkin Dev. Corp., supra.
The district court’s factual finding that certain conduct violates the building restrictions is subject to manifest error review. Harrison v. Myers, 25,902 (La. App. 2 Cir. 6/22/94), 639 So.2d 402.

Discussion: Harmony with Surrounding Structure or Structures

By his first assignment of error, Hannigan urges the district court erred in comparing his construction with the surrounding structures (plural) instead of his own structure (singular). He argues that Art. IX, § 2 governs; [¿the architectural control committee is to approve modifications “as to the natural harmony of the exterior design with the existing structure!.]” He contends that this court has already applied Art. IX literally, refusing to make a member remove a portable metal storage shed. Jackson Square Towne House Homes Ass’n v. Mims, 393 So.2d 816 (La.App. 2 Cir.1981). He concludes that the trial court committed legal error, mandating de novo review. Referring to the photos, he submits that the enclosure perfectly matches the exterior style of his unit.
The Association responds that like any building restrictions, the covenants must be read for their plain meaning, in their entirety, and to avoid absurd consequences. Whitaker Const. Co. v. Larkin Dev. Corp., supra. It particularly notes that Hannigan’s brief totally ignores Art. VI. It concludes that the court was not plainly wrong to read Arts. VI and IX *964 together or to find that the Association can control structures being built “as they pertain to surrounding structures.”
We have closely read both Art. VI and Art. IX and find the district court did not err in its interpretation of the covenants. Both clearly require the owner to submit a plan and specifications for the approval of the board of directors (acting as the architectural control committee), or the committee itself, before any “exterior addition or change or alteration” (Art. VI) or before any building may be “altered on any lot” (Art. IX). Hannigan admittedly failed to submit a plan and obtain approval before he enclosed his patio. This was plainly a violation of both provisions. Brier Lake Inc. v. Jones, supra.
17Moreover, Art. IX provides what the plan and specifications must show, while Art. VI expressly states that the construction must be in harmony with the existing structures. There is no showing that this requirement — that the exterior addition or alteration to be in harmony with the existing structures — would lead to absurd consequences or defeat the purposes of the covenants. In short, we perceive no error in the district court’s interpretation or application of these articles.
By his second assignment, Hanni-gan advances the alternative argument that even if the court properly interpreted the covenants, it committed manifest error in finding his construction was out of harmony with the surrounding structures. Again referring to the photos and to his own testimony, he argues that his enclosure is “more harmonious with the other townhomes than some of the other patios and out buildings.”
The Association responds that the appropriate standard of review is manifest error. Harrison v. Myers, supra. It reiterates that no other unit in Jackson Square has an enclosed patio, so the district court’s finding cannot be plainly wrong.
The district court carefully described the evidence and concluded:
Examination of the testimony and the photographic evidence reveals that the construction is, in fact, out of harmony and-inconsistent with the exterior of the town homes and is thus a violation of Art. 9, § 2[J Specifically, no townhouse has a fully enclosed patio; therefore, it cannot be said to be in harmony.
Nothing contradicts the finding that Hannigan’s unit is the only one in the development with an enclosed patio. The photos show that the enclosure is similar in style and color to Hannigan’s unit but that it stands |sout from the rest of the back patios. On this record, we simply cannot say the district court was plainly wrong to find it out of harmony with the surrounding structures. Harrison v. Myers, supra.
By his third assignment, Hannigan urges the district court erred in upholding the architectural control committee’s decision because the committee failed to apply the standards required by the covenants. The thrust of the argument is that the committee should have compared the patio enclosure only with Hannigan’s townhouse, not with the rest of the surrounding structures. For the reasons already discussed, the district court did not err in requiring harmony with existing structures; a fortio-ri, the board did not err in applying the same standard. This assignment of error lacks merit.

Timeliness of Suit

By his fourth and fifth assignments, Hannigan urges the suit was untimely. He cites this portion of Art. IX, § 2:
*965 [I]f no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.
He contends the court was plainly wrong to disregard his testimony that construction was complete by the time the Association filed suit on February 3. He concedes that no Louisiana case addresses this issue, but he submits that other state jurisprudence is persuasive. Specifically, he cites Dodson v. Fannon, 368 So.2d 270 (Ala.1979), for the proposition that in the procedure clause of a restrictive covenant, “complete” means “substantially complete.”
|9The Association replies that the district court’s finding of substantial completion is factual and can be reversed only if plainly wrong. Peterson Contractors Inc. v. Herd Producing Co., 35,567 (La.App. 2 Cir. 2/27/02), 811 So.2d 130. It further contends that in its entirety, Art. IX, § 2 waives approval only if the association “fails to approve or disapprove within thirty (30) days after plans and specifications have been submitted to it.” Since Hannigan did not submit a timely plan, there was no waiver. Finally, the Association urges that Dodson v. Fannon, supra, is inapposite.
The district court found that the project was not complete on February 3, 2003. While Hannigan, a retired building contractor, may have felt the remaining work was inconsequential, the average homeowner would likely have to hire a professional to tape and float Sheetrock, and perhaps even to paint the finished product. We perceive no manifest error in the district court’s commonsense finding. Peterson Contractors Inc. v. Herd Producing Co., supra.
Moreover, the Association first learned of Hannigan’s project on the afternoon of January 21, when he had already sealed off the 35-foot strip. The board rejected his belated plan on January 25, when he had completed the exterior work. The Association filed suit on February 3, eight days after the vote. On these facts, the district court was entitled to find that the Association moved with suitable alacrity to avoid waiving its claim under Art. IX, § 2. By contrast, in Dodson v. Fannon, supra, the plaintiff learned of the non-conforming construction in June but did not file suit until late August. Mr. Fannon’s unexplained delay perhaps warranted the result in hpthat case, but such a factor is simply not present here. These assignments of error lack merit.

Attorney Fees

By answer to appeal, the Association urges the district court abused its discretion in awarding attorney fees of only $1,875.00, despite the affidavit claiming fees of $2,572.50. The Association argues that Hannigan did not show that the hourly rate or the amount of time claimed was unreasonable. It concludes that the court should normally honor a party’s contractual relationship with its attorney. Salsbury v. Salsbury, 27,062 (La.App. 2 Cir. 6/21/95), 658 So.2d 734.
Hannigan replies only that the issue is moot because the Association is bound to lose on the merits, a position obviously without merit.
Article VI(b) provides for reasonable attorney fees in the event the Association takes legal action to enforce the covenants. Courts may always inquire into the reasonableness of attorney fees as part of their prevailing inherent authority to regulate the practice of law. Rivet v. State, 2001-0961 (La.11/28/01), 800 So.2d 777. The court is not bound by a contingency fee contract or the amount actually *966 charged by the attorney. City of Shreveport v. Chame Gas Corp., 34,958 (La.App. 2 Cir. 8/22/01), 794 So.2d 962, writs denied, 2001-2657, 2660 (La.1/4/02), 805 So.2d 209.
The district court made no finding that the hourly rate or the number of hours charged by the Association’s attorney was excessive. Considering the relatively short time frame for drafting and filing the petition, the average complexity of the issues presented, and the results attained, we findJjjthe fee claimed by the Association’s counsel for his work in the district court was not excessive. We therefore amend the judgment to award the full amount, $2,572.50.

Conclusion

For the reasons expressed, the judgment is affirmed insofar as it granted the permanent injunction in favor of the Association, prohibiting Hannigan from enclosing his rear patio and ordering him to remove any construction already in place and restore the premises to their prior condition. The judgment is amended only to increase the award of attorney fees in the district court to $2,572.50. Costs of appeal are assessed against Hannigan.
AMENDED AND AFFIRMED.

. The court's written reasons actually referred to "Article 5 of the covenants,” an obvious typographical error.